# Exhibit B

IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:14-CR-00059-SLG |
| | ) | |
| Plaintiff, | ) | |
| | ) | DECLARATION OF |
| v. | ) | PAUL D. STOCKLER |
| | ) | |
| PAUL D. STOCKLER, | ) | |
| | ) | |
| Defendant. | ) | Case Filed: 06/19/2014 |
| | ) | |

I, PAUL D. STOCKLER, declare:

1. I am a father and an attorney who lives in Anchorage, Alaska. I have one daughter, Senna, age 20. In 2002, my wife and I permanently separated and our divorce was finalized on April 26, 2005. From 2002 on, I shared joint physical and legal custody of my daughter with my now-former wife.

2. After graduating from law school in December, 1985, I moved to Anchorage, Alaska and began practicing law. Since 1992 I have been a solo practitioner, at the Law Office of Paul D. Stockler. In 1996 I took a one year leave of absence from my solo practice to serve as Special Counsel to the Government Affairs Committee under Senator Ted Stevens. Prior to 1992, I worked for five years as an Assistant District Attorney and two years at private law firms.

3. At no time in my almost 30 years of law practice have I practiced tax law in any forum: criminal, civil, or administrative.

4. In addition to practicing law, I worked as a day trader from 2001 through 2006. I woke up by 5 am and begin my trading activities which including market research and buying and selling securities and options. I also reviewed the results of NASDAQ as well stock markets in Europe and Asia each night prior to trading the next morning. I spent an average of 4-5 hours a day working as a day trader. I ceased my day trading business in early 2007.

5. In 2004, I traded 66% of the days the NASDAQ market was open and between purchases of securities and options, and sales of securities and options, I completed 964 transactions averaging 3.8 trades per day available trading day. In total, I purchased $4,107,610 and sold $3,928,494 of securities.

6. In 2005, I traded 59.13% of the days the NASDAQ market was open and between purchases of securities and options, and sales of securities and options, I completed 665 transactions averaging 2.64 trades per available trading day and 4.5 trades per actual trading day. In total, I purchased $1,062,942.65 and sold $1,006,815.68 of securities.

7. In 2006, I traded nearly 50% of the days the NASDAQ market was open and between purchases of securities and options, and sales of securities and options, I completed 931 transactions averaging 3.71 trades per available trading day and 7.5 trades per actual trading day. In total, I purchased $20,041,085.67 and sold $17,851,765.35of securities.

8. During 2004-2006, my trading activities were concentrated on the buying and selling securities for daily profit. I concentrated on one security in particular, SanDisk Corporation, and attempted to profit from daily movements in the price of that security.

9. I placed the trades on a computer located in my home office on the platform provided by Brown & Co. and later E-Trade, the successor to Brown & Co. Both of these companies provided me with an electronic trading platform on which I could buy and sell

2

securities including stocks and options. All of my trades were self-directed through the use of these trading platforms.

10.     I had hoped that my trading activities would eventually be successful enough that I could stop practicing law. Even though I dedicated significant time to my trading activities, I did not achieve a level of financial success in trading that I was ever able to give up the practice of law.

11.     I have acknowledged and accepted responsibility for my failure to file tax returns in 2006, 2008, and 2009 by entry of an early plea in this matter.

12.     In 2006 a former client of mine's company went bankrupt and I was ordered to return $1 million in legal fees previously paid for work I performed on behalf of the client. In 2008, I paid the $1million claw-back.

13.     In 2005, I was in need of an accountant in connection with my pending divorce proceedings, past unfiled tax returns, and current tax returns to be filed. On recommendation of a neighbor, and a fellow business owner, I sought services from Terry Goddard, a certified public accountant in Yakima, Washington. At the time I retained Mr. Goddard his certified public account license was in good standing, (and had been since the date of issuance), and he had owned and operated a tax advisory business for over 20 years.

14.     In early 2005, I personally met with Mr. Goddard regarding the filing of tax returns for 2004. At that time, I provided Mr. Goddard with a complete set of my 2004 trading records along with my other financial information so that Mr. Goddard could advise me and prepare my tax returns. The trading records I provided Mr. Goddard included monthly statements from Brown & Company and E-Trade that fully delineated all of my substantial daily

3

trading activities. I had in-person meetings, spoke, and corresponded with Mr. Goddard and other members of his staff multiple times in early 2005 during the tax return preparation process.

15. At no time during any of my conferences and correspondence with Mr. Goddard or his staff did Mr. Goddard ever mention, discuss, or raise the issue of me making a 475(f) election for the 2005 tax year even though Mr. Goddard was on notice of my substantial trading activity in 2004 since I had provided him with a detailed copy of my trading records. Mr. Goddard never discussed with me the details of my past or current trading activities or that I would qualify as a securities trader. Mr. Goddard never informed me about the opportunity to elect mark-to market treatment of the gains and losses from my trading business and that I would need to make that election at the time I filed my 2004 tax return (April 15, 2005) for the proceeding 2005 tax year.

16. In early 2006, I again met with Mr. Goddard in preparation for the filing of my 2005 tax returns. I again provided Mr. Goddard with my detailed trading records for 2005, along with my other financial information for the tax returns. Mr. Goddard prepared and filed my 2005 tax returns, including a Schedule D form listing options short terms gains and losses of $444,308 from trading, and again deducting $3,000 in losses on line 14.

17. It was not until 2013, that I learned of the existence of "trader" status and that pursuant to Internal Revenue Service Treasury Regulation § 301.9100-3 I could be granted an extension of the deadline to file a mark-to-market election under 26 United States Code § 475(f) for the 2005 and 2006 tax years.

18. The time commitments of my law practice varied from year to year. In 2006, I served as lead counsel in the matter of *United States v. Kane*, 3:06-CR-00022. The complaint in that matter was filed on February 2, 2006 and the trial concluded on May 26, 2006. I was able

4

Declaration of Paul D. Stockler
*United States v. Paul D. Stockler*, Case No. 3:14-CR-00059-SLG

Case 3:14-cr-00059-SLG   Document 24-2   Filed 03/10/15   Page 5 of 7

to compensate for the time I could not actively place trades when I was involved in trial preparation and trial, in *United States v. Kane,* by spending 5-10 hours a day trading during the time period after the trial concluded. However, while in the heat of trial preparation and trial, I still researched and analyzed my holdings, the markets, and their movements on average 1-2 hours a day, however, I did not engage in active trading.

19. My law practice did not provide me with a guaranteed salary and/or stock options. The income I derived from my law practice varied from year to year and there was no guarantee I would continue to earn income at the same rate from month to month or year to year as I was not receiving payments on any long-term retainer agreements.

20. My trading objective was to seek to profit from daily market movements in the prices of securities and not from dividends, interest, or capital appreciation. I did not purchase securities as long term investments and then hold them for long periods of time. The research I conducted as part of my trading activities was to understand and follow the markets daily trends rather than performance on a quarterly or yearly basis.

21. I often purchased and sold the security in the same day. I treated each day in which I traded as an independent opportunity to profit from the markets activity that day.

22. I specifically hired Mr. Goddard because I needed expert advice in the preparation of my taxes. I reasonable relied on the advice and information I received from Mr. Goddard, a Certified Public Accountant who had owned and operated a tax advisory for over 20 years. I provided Mr. Goddard with my detailed trading records for the 2004 and 2005 tax year delineating each purchase and sale of security I executed those years. Mr. Goddard, however, never inquired with me about any of the particulars of my trading activity such as how many

hours a day I spent trading or the specific strategy of trying to catch the daily swings in the market rather than investing for the long term.

23. Mr. Goddard never discussed with me that there were specific accounting rules that applied to "traders." Mr. Goddard never asked me about the details of his trading activity to determine if I should apply for trader status.

24. I was unaware of the existence of the availability of the § 475(f) election as a result of improper tax advice from my accountant and I first learned of the § 475(f) election in August, 2013. Had I known about the election, I would have made the election and my trading losses would have been fully deductible against income rather than be limited to $3,000 per year in the 2005 and 2006 tax years.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on 3·10·15 , in Anchorage, Alaska.

Paul D. Stockler

6

Declaration of Paul D. Stockler
United States v. Paul D. Stockler, Case No. 3:14-CR-00059-SLG

Case 3:14-cr-00059-SLG   Document 24-2   Filed 03/10/15   Page 7 of 7